Milligan, J.,
delivered the opinion of the court:
On the 12th of May, 1855, the claimants entered into a written contract with the United States, acting through Capt. D. Lead-better, Corps of Engineers, to furnish materials and erect certain buildings suitable for officers’ quarters, garrison purposes, &e., at Fort Gaines, Dauphin Island, Ala.
The contract sets forth the number and kind of buildings to be erected, and then declares: “ The positions to be occupied by these structures, both in plan and elevation, shall be marked by the party of the first part, as shown in the drawings of Fort Gaines and its buildings, now on file in his office, and the whole shall be built in general conformity to the said plans to which reference was had in making the estimates for the work.”
The work contemplated by this agreement was to be begun and prosecuted without delay to completion by the 1st of January, 1856.
On the completion of the work within the time and manner specified in the contract, the United States were to pay the claimants the sum of $50,000. But of this amount, payments were to be made, from time to time, in sums not less than $5,000. Fifteen per cent, on the engineer’s estimate was to be *322 retained on each payment, to insure tbe completion of the. work, and if it was not completed according to contract, the amount thus retained was to be forfeited.
Soon after the contract was entered into, the claimants began preparations to carry it out, aiid after having made all the necessary arrangements for its speedy fulfillment, they were notified by Captain Leadbetter, chief engineer, to suspend the work until further orders.
The notice of suspension was given on the 17th of July, 1855, and the next day the contractors informed the engineer, by letter, that they had made all necessary arrangements for carrying out the contract, expended money, contracted liabilities, and abandoned other undertakings to accomplish this purpose; and that they would expect compensation for the delay occasioned by his order.
The work remained suspended until the 18th of October, 1855, when the contractors were formally notified to proceed with the execution of the contract. They did so, but did not complete its fulfillment until February, 1857.
The work was done to the satisfaction of the Government, and the contractors have been paid the full contract price. Nothing remains due on the contract, and nothing is claimed in this suit for work performed. It is brought for the sole purpose of recovering the damages which the claimants aver they sustained in consequence of the defendants’ wrongfully stopping the work.
The case was referred to this court by resolution of the Senate June 8, 1858 ; and the claimants’ right to recover rests substantially on the facts stated.
The case, as thus presented, is somewhat novel in at least one of its features. It involves the question of the right of the claimants to recover'damages for a wrongful temporary suspension of the fulfillment of a written contract by the defendants, which the claimants afterward, at the instance of the defendants, did perform, and for which they have been fully paid.
Constituted as this court is, the rules of technical pleading which might be applied here need not be discussed. It is enough that they have not been relied on by the parties, and if they had, under the repeated rulings of the Supreme Court, it would be our duty to decide the case on its merits, without regard to technical rules.
*323 '.Regarding it in this light, it is obvious the action is maintainable 5 for it cannot be assumed that one party to a contract can wrongfully delay its performance, without exposing the other to losses and injuries for which the law affords redress. But the rule by which such losses are to be measured, after full performance, as in this case, presents more difficulty.
On well-settled authority, if the Government suspended the work for a time which necessarily prevented the claimants from performing their-part of the contract, according to the terms of the agreement, they might have treated it as rescinded, and sued and recovered damages for the breach. But they did not elect to avail themselves of this mode of redress; but chose to wait the pleasure of the Government, and at its option to proceed with the fulfillment of their contract. ,
But after the resumption of the work, they continued to assert their right to damages for the suspension, and the Government, through its engineer in charge of the work, did not hesitate to concede this right; and now to deny its enforcement would be an injustice which no court could afford to perpetrate.
But how should the losses or damages be measured? No case in all its features has been found identical with this. The rule, in eases in which the defendant has wrongfully put an end to the fulfillment of the contract, has repeatedly been declared by the Supreme Court. In the case of the Philadelphia, Wilmington and Baltimore Railroad v. Howard, (13 Howard’s R., p. 344.) the court, after declaring that the actual damages is all that can lawfully be given in an action in covenant, proceed to say: “Actual damages clearly include the direct and actual loss which the plaintiff sustained, pfopter rem ipsam non habitam, and in cases of a contract like this, that loss is, among other things, the difference between the cost of doing the work and the price to be paid for it.”
In Speed’s Case, (7 C. Cls. R.., p. 93,) which went from this court, the Supreme Court, in laying down the rule of damages, say: “ We do not believe that any safer rule, or one nearer to that supported by the general current of authorities can be found than that adopted by the court, to wit, the difference between the cost of doing the work, and what claimant was to receive for it, making reasonable deductions for the less time engaged, and release from the care, trouble, risk, and responsibility attending a full execution of the contract.”
*324 But this rule, however just in the class of cases to which it has been applied, does not accurately measure the damages in a case like the one before us. Here the work is merely suspended to be resumed at the pleasure of the defendants. The claimants are not released, as in cases where the contract is ended by the defendants, from the care, trouble, and responsibility attending its fulfillment; but they are obliged to hold themselves and hands, at all times, in readiness to resume the work whenever called on by the Government.
Besides, the delay caused by the suspension pushed the execution of the contract over into a more inclement season, when it was more difficult to perform the work, and when the cost of material, the wages of labor, freight, See,., were much higher than they were when the work was suspended. All these and such like elements enter into the consideration of damages j and in this case, the increase in the wages of labor, cost of materials, <&c., must be understood as constituting a part of the direct damages.
But as the contract could not have been completed before the suspension, had the'claimants not been interrupted, they should not be allowed damages for the increase of prices for a longer period after the work was resumed than the time it was suspended. That is to say, as the wages of labor, cost of material, & cl, continued at the same low rate from the beginning of the work, through the period of suspension, to the time it was resumed, and then rose to nearly o.r quite double the former rates, the claimants are entitled to the benefit of the increase of prices for a period corresponding to the time the work was suspended, but no longer, because the rise occurred before the time expired within which the work was to be completed. The contractors were compelled in any event to encounter the period of high prices; but by the wrongful act of the defendants, they were forced to perform more of the work within it than they would have performed, had the work not been interrupted; and they are, therefore, entitled to recover the actual damages sustained.
Regarding the damage in this light, and turning to the proof, it appears at the time the execution of the work was suspended, the (Claimants had forty laborers, ten mechanics, and two overseers employed on the work. They had erected a wharf on the island, built quarters for the hands, work, lime-sheds, &c.
*325 They bad also purchased a large quantity of brick, six hundred barrels of cement, lumber, &c. The brick and. cement were in the city of Mobile, and a portion of the lumber had been transported to the island, where about 100,000 feet of it was washed away and stolen during the suspension, which is estimated by the witnesses to have been worth $700.
The wharf.was injured by the floods and drift-wood, and the piling by worms, &c.
In May, when the work commenced, until July, when it was suspended, the weather was fine and the surface of the earth free from water. And this state of things continued until the latter part of October, when the work was resumed. The autumnal rains then came on, and the contractors had at least four feet of surface-water to contend with in laying the foundations, sinking the cisterns, &c. Labor had risen from $ 15 per month to $25 or $30; mechanics’ wages from $30 to $40 per month, and overseers from $60 to $70 and $75. Provisions had advanced from 15 to 20 per cent., and it was much more difficult and expensive to transport material from the city to the island.
The customary price of freight from Mobile to the island is $3 per thousand brick during the summer months, and in the fall, during the business season, from $4 to $5 per thousand.
From these facts, coupled with the direct proof in the record, the court deduces the following damages:
The work was suspended on the 17th of July, 1855, until the 18th of October following, a period of ninety-three days, less thirteen Sundays, leaving eighty working days.
40 laborers, at 50 cents per day, 80 days.$1,600
10 mechanics, at $1 per day, 80 days. 800
2 overseers, at $2 per day, 80 days... 320
-$2, 720 00
Cost of subsisting 52 men 93 days, at 20 cents per day.'.% 967 20
Increase in price of labor after suspension :
40 laborers for 3 months, $10 per month. 1,200
10 mechanics for 3 months, $10 per month.... 300
2 overseers for 3 months, $10 per month. 60
- 1,560 00
Increase in cost of subsisting 52 hands 93 days, 15 per cent. 145 08
*326 Increase in freight on 600 barrels cement from New York to Mobile. 150 00
Increase in freight, $1.50 per thousand, on 500,000 brick to island...... 750 00
Value of 100,000 feet of lumber, washed away and stolen... 700 00
Total. 6,992 28
The proofs show other losses, but furnish no sufficient data by which we can estimate them. We therefore find the claimants entitled to recover the sum of $6,992.28, for which judgment will be entered.